UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                      NO: 13-66

NEMESSIS BATES                              SECTION: R(4)

## ORDER AND REASONS

Defendant Nemessis Bates moves for a judgment of acquittal under Federal Rule of Criminal Procedure 29 and a new trial under Federal Rule of Criminal Procedure 33. For the following reasons, the Court denies Bates's motion.

## I. BACKGROUND

This case is a murder-for-hire prosecution arising from the November 21, 2010 killing of Christopher "Tiger" Smith (the "Victim"). On April 4, 2013, a federal grand jury returned a four-count indictment charging defendants Nemessis Bates and Aaron Smith with the murder of the Victim. Defendant Aaron Smith pled guilty to Count Three of the indictment--causing death through the use of a

firearm in violation of 18 U.S.C. §§ 924(j) and 2--on October 31, 2013.[1]

On April 17, 2014, a grand jury returned a four-count superseding indictment charging defendants Nemessis Bates and Walter Porter with the murder of the Victim.[2] Specifically, the indictment charged Bates with solicitation to commit a crime of violence, in violation of 18 U.S.C. §§ 1958(a) and 373; conspiracy to use and use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. §§ 1958(a) and 2; causing death through the use of a firearm, in violation of 18 U.S.C. §§ 924(j)(1) and 2; and conspiracy to possess a firearm, in violation of 18 U.S.C. § 924(o). The indictment also charged co-defendant Walter Porter in Counts Two through Four.  On September 30, 2014, the Court granted Bates's motion to sever his trial from that of Porter.[3]  Porter is still awaiting trial.

---

[1]    R. Doc. 75.

[2]    R. Doc. 99.

[3]    R. Doc. 156.

Bates's trial commenced on June 1, 2015. The Government sought to prove that the Victim stole jewelry and money from Bates, and that Bates later hired Aaron Smith and Walter Porter to murder the Victim in exchange for $20,000. According to the Government's theory of the case, defendant Walter Porter was the actual shooter. In contrast, Bates sought to show that Smith and Porter, knowing that the Victim had stolen from Bates and knowing that Bates had financial resources, conspired to murder the Victim to extort Bates for money. On June 4, 2014, the Government and defense rested. After deliberating for approximately three hours, the jury found Bates guilty on all counts.

Bates now moves the Court, under Federal Rule of Criminal Procedure 29 for a judgment of acquittal, or, in the alternative, under Federal Rule of Criminal Procedure 33 for a new trial. He provides three grounds for his motion. First, Bates asserts that there was insufficient evidence to establish (1) that Aaron Smith met Bates on November 19, 2010, when Bates allegedly initially discussed the murder-for-hire with Smith and stated he

3

was willing to pay $20,000, and (2) that Aaron Smith and Walter Porter met Bates on November 20, 2010, when Bates allegedly confirmed the $20,000 murder-for-hire and showed them a picture of the Victim on Facebook. Second, Bates challenges the credibility of Government witnesses Aaron Smith, Denisa Hancock, Keith Hamilton, and Anthony Comadore. Smith testified at great length as to his, Bates's, and Porter's involvement in the murder-for-hire plot. Hancock, Hamilton, and Comadore all testified that Bates told them he hired Smith and Porter to murder the Victim. Third, Bates asserts a Sixth Amendment violation based on the testimony of Anthony Comadore, a fellow inmate, about statements Bates made to Comadore while incarcerated in which Bates admitted to hiring Porter to murder the Victim.

The Government opposes the motion. It contends that ample evidence, including witness testimony corroborated by cell phone records and cell-site location analysis, supports the jury's conviction of Bates. Further, the Government asserts that no Sixth Amendment violation

4

occurred because Comadore did not act as a Government agent when Bates made the inculpatory statements to him.

## II. EVIDENCE PRESENTED AT TRIAL

Initially, the Government presented evidence pertaining to the theft of Bates's jewelry and money. Officer Edwin Yeager of the Kenner Police Department testified that, on June 11, 2010, he responded to Bates's report of the theft of jewelry and money from his home. According to Officer Yeager, approximately $20,000 in money and $100,000 in jewelry were stolen. Bates told Yeager he suspected that the Victim, Christopher Smith, and an individual identified only as "Demetrius" stole the items.

The Government next presented evidence related to the murder of the Victim on the evening of November 21, 2010. Captain Dennis Thornton, Commander of Homicide for the Jefferson Parish Police Department at the time of the murder, responded to calls of a shooting on the evening of November 21, 2010. Upon arriving at the Victim's residence, he observed the Victim's body lying in the

doorway.   According to Captain Thornton, the Victim's body position suggested that the Victim was entering the house at the time of the shooting, that there was no struggle, and that no one entered the Victim's residence after the shooting.   Captain Thornton also testified that the Victim still had money in his pocket when the police found his body.   The police recovered twenty-eight bullet casings from the scene.   Captain Thornton also testified that investigating officers found appraisals of the jewelry reported stolen by Bates in the Victim's residence, but that they did not find the jewelry.

Dr. Susan Garcia, the deputy coroner and forensic pathologist in Jefferson Parish conducted an autopsy on the Victim.   She recovered eighteen projectiles from his body, and determined that the Victim sustained at least twenty gunshot wounds.   She testified that the gunshot wounds caused the Victim's death.   Colonel Timothy Scanlan, the laboratory services commander in the Jefferson Parish Police Department, testified that all casings found at the murder scene were fired from the

same weapon.  He further testified that there was no evidence of the use of another weapon at the scene.

Next, the Government presented evidence of the murder-for-hire plot.  Aaron Smith testified at length as to his involvement and provided the following account. Smith testified that Julius Williams, an associate of both Bates and Smith, introduced Smith to Bates after Williams told Smith that Bates was willing to pay $20,000 for a murder.  On November 19, 2010, Smith went to Bates's carwash with Williams, at which point Bates offered Smith $20,000 to have "business handled."  Smith understood this to mean a "$20,000 hit."  Smith told Bates that he could not personally perform the killing because he was on home incarceration and was required to wear an ankle monitor, but that he could find someone else to do it.  Shortly after this meeting, Smith related the conversation to a friend, identified only as "Wayne," who lived with Walter Porter at the time.

On November 20, 2010, Porter, having learned of the murder-for-hire offer, came to Smith's house to express his interest in conducting the hit.  Smith testified that

he offered Porter $10,000 to carry out the hit.  Porter
accepted the offer, but told Smith that he wanted to
speak with Bates first to confirm that Bates was serious
about carrying out the murder.  On the same day, November
20, 2010, Smith and Porter drove to Bates's carwash.
Smith introduced Porter to Bates as the individual who
could carry out the murder.  According to Smith, Porter
said to Bates, "You want that business handled?" to which
Bates responded, "Yeah."  Porter then asked, "How much
you got?" to which Bates responded, "$20,000."  Porter
responded, "Have my money when I get back."  Smith
testified, "We were talking about someone getting killed
for $20,000."  After this meeting, Smith and Porter
agreed that they would each take $10,000 for the murder.
Smith testified that Bates then provided Smith with the
Victim's address and a description of his car, and showed
Smith a picture of the Victim on Facebook using Smith's
iPhone.  Smith then entered the Victim's address into his
GPS and drove to the Victim's home to conduct
surveillance.

At trial, the Government corroborated Smith's testimony about the November 20, 2010 meeting. Special Agent William C. Williams performed cell-site analysis of Bates's and Porter's cell phone records. He testified that the records showed Bates was in the area of his carwash on the morning of November 20, 2010. Williams further testified that, on this day, Porter made a phone call near his own home at 8:31 a.m. and then did not make another call until 10:14 a.m.; this provided approximately one hour and forty-five minutes in which Porter could have been at the carwash.

Smith further testified that at 1:47 p.m. on November 20 he sent Bates his cell phone number via text message so that Bates would have it. The cell phone records show a zero second contact between Smith's and Bates's phones at this time, indicating that a text message could have been sent. On the evening of November 20, Smith and Porter exchanged numerous phone calls, reflected in the phone records, during which, according to Smith, he directed Porter to the Victim's residence. Special Agent Williams testified that a cell-site location analysis of

Porter's cell phone records showed him in the vicinity of the Victim's home between 4:04 and 6:41 p.m. on November 20.

Smith testified that on the morning of November 21, 2010, he and Porter drove to the Victim's residence. Special Agent Williams testified that Porter's cell phone records showed him in the vicinity of the Victim's home between 9:33 and 10:37 a.m. on November 21. Smith testified that they saw the Victim outside his residence, and then followed him in his vehicle when he drove away. Smith and Porter followed the Victim to his church and then to Bates's carwash. Special Agent Williams testified that Porter's cell phone records show him in the vicinity of the church at 11:56 a.m., 12:26 p.m., and 1:24 p.m., and in the vicinity of the carwash shortly after. Smith testified that when he realized that the Victim was driving towards Bates's carwash, he attempted to call Bates to warn him. The phone records reflect a number of calls from Smith to Bates between 1:10 and 1:18 p.m. on November 21. Smith and Porter then saw the Victim speak to Bates, after which the Victim left the

carwash.    Smith  and  Porter  attempted  to  follow  the
Victim, but lost him in traffic.    Smith and Porter then
returned to the carwash.    According to Smith, Bates told
Smith that the Victim confronted Bates about putting a
hit out on him, but Bates denied that he had done so.
Smith then told Bates that he would not have to worry
about the Victim coming to see him anymore and that "it"
would be over soon.    Smith and Porter then parted ways,
with Smith returning to his home.

That    evening,    the    Victim    was    murdered    at
approximately 8:09 p.m.  Special Agent Williams testified
that Porter's cell phone records show him in the vicinity
of the Victim's residence between approximately 6:01 and
8:09 p.m that evening.    The phone records also reflect a
call from Porter to Smith at 8:14 p.m. on November 21.
Smith testified that Porter called to tell Smith that he
killed the Victim and to instruct Smith to call Bates to
make  sure  Bates  had  the  money  ready.    Smith  then
attempted to call Bates multiple times, but Bates did not
answer.  Special Agent Keith Buriss testified that the
phone records reflect five calls from Smith to Bates

immediately after Porter's call to Smith.   The phone records further reflect that after receiving these calls, Bates called his cousin, Nakeyius Jackson.  At 8:23 p.m., as reflected in the phone records, Bates called Smith. Smith testified that he told Bates that they killed the Victim, to "watch the news," and to have the money ready. After this call between Smith and Bates, the phone records reflect Bates calling Nakeyius Jackson eight more times that night.

The following morning, November 22, 2010, Smith and Porter went to the carwash to collect the money from Bates.  Special Agent Williams testified that Porter's phone records show him in the vicinity of the car wash at 10:07, 10:35, and 11:02 a.m.  Apparently, Bates had only $2000, which, according to Smith, Bates's cousin Nakeyius Jackson had withdrawn from his girlfriend's account. Jackson's bank records reflect a $2000 withdrawal on November 19, 2010.  Because Smith and Porter received only $2000, they returned to the carwash the next day, November 23, 2010.  Special Agent Williams testified that the phone records show Porter's phone in the vicinity of

the carwash on that morning.  According to Smith, at this point, Porter demanded that Bates rent him a car.  Smith and Porter also decided to take Bates's Mercedes Benz and Corvette as collateral.  Smith testified that he, Porter, and Bates drove to the Hertz outlet near the New Orleans airport, and Bates rented Porter a car.  Special Agent Williams testified that Porter's phone records show him in the vicinity of the airport and Hertz at 11:32 a.m., 12:20 p.m., and 12:21 p.m.  He also testified that Bates's phone records showed Bates in the same locations as Porter during this time.  A November 23, 2010, Hertz record reflects that Bates rented a Toyota Camry with the license plate number ZAF37R that day.  According to Smith, they then drove back to the carwash, and Smith took Bates's Mercedes.  Apparently, Porter went out of town for several days with the rental car: a Florida highway patrol traffic citation reflects that Porter was issued a citation on November 24, 2010, while driving the car that Bates rented.  Smith testified that when Porter returned he gave Smith the rental car and took Bates's Mercedes from Smith.  At this point, Smith returned the

rental car on November 30, 2010, and took Bates's Corvette. On January 26, 2011, a New Orleans Police Department field interview card reflects that Porter was stopped while driving the Mercedes registered to Bates.

Smith testified that, over the course of several months, he and Porter met with Bates multiple times and exchanged multiple phone calls in attempts to collect the money. At one point, Smith and Porter went with Bates to the home of Bates's ex-boyfriend, Keith Hamilton, because Bates thought Hamilton would give him money to pay Smith and Porter. Hamilton refused to give Bates any money. Eventually, Bates paid Smith $10,000, at which point, Smith returned Bates's Corvette. Bates's bank records reflect a $10,000 deposit on February 8, 2011, and a $10,000 withdrawal on February 10, 2011. Phone records show contact between Smith and Bates on February 10, and Smith's ankle monitor log shows him leaving his house on this day. At trial, however, Smith could not recall when he received the $10,000 payment. According to Smith, Bates later paid Porter the remaining $8000, at which time Porter returned Bates's Mercedes.

On cross-examination, defense counsel established that (1) Smith testified under a plea agreement with the Government requiring his cooperation, (2) Smith used drugs during the period of events described, (3) Smith has multiple prior convictions, (4) Smith testified that he would lie to the police, and (5) Smith testified inconsistently with his factual basis in one instance.[4]

The Government next presented additional evidence corroborating Smith's account. Denisa Hancock, Bates's girlfriend at the time of the murder, testified as to Bates's behavior around the time of the murder. According to Hancock, on the evening of the murder, November 21, 2010, Bates appeared anxious and had multiple private conversations on his cell phone; she did not hear the conversations. She testified that she spent the night at Bates's home. The next morning, November 22, 2010, Bates asked Hancock for the television channel number to watch the news. Hancock testified that this

---

[4]      Smith's factual basis states that Smith knew before the murder that the Victim had stolen Bates's jewelry, but, at trial, Smith testified that he did not know about the stolen jewelry until after the murder.

struck her as odd because Bates never watched the news.
Upon seeing reports of the Victim's murder, Bates stated,
"Tiger's murdered," and began crying.  Hancock testified
that Bates then said, "I just could not let it go that he
stole from me."  At a later date, Hancock and Bates were
at the carwash and Bates, referring to two individuals,
told Hancock, "Those are the killers."  Hancock testified
that she had seen these two individuals multiple times at
Bates's carwash.  She testified that they always drove up
in a white Chevrolet Trailblazer, with the license plate
number PYVB869.[5]  Smith testified that he drove a white
Trailblazer.   At  trial,  Hancock  identified  the
individuals as Aaron Smith and Walter Porter.  Hancock
testified that Bates later admitted to her that he hired
Smith  and  Porter  to  kill  the  Victim.   She  further
testified that Bates threatened to kill her if she
reported anything to the police.   Finally, Hancock
testified that Bates never told her that he was being
extorted  for  money  over  the  murder.   On  cross-

---

[5]    At trial, the Government introduced a screen shot of a
note Hancock recorded on her cell phone reflecting the license
plate number.

examination, Hancock testified that she had keyed one of Bates's cars in the past when she thought Bates was with another woman.  She also testified that she had no desire to testify against Bates.

Keith Hamilton, Bates's ex-boyfriend, testified that Bates told him the Victim had stolen his jewelry. According to Hamilton, Bates was very upset about the theft.  Hamilton testified that Bates eventually admitted to Hamilton that he ordered a hit on the Victim. According to Hamilton, Bates told him, "It was a $10,000 hit.  I'm involved."  Bates also told Hamilton that the killers took his Mercedes as collateral.  Hamilton testified that Bates asked him for money to pay off the killers, but Hamilton refused to become involved. Because Hamilton regularly spent time at Bates's carwash, he began to notice that two individuals came to the carwash frequently in a white Chevrolet Trailblazer, with the license plate PYVB869.  Hamilton also corroborated Smith's testimony about the events of December 25, 2010, when Bates, Smith, and Porter went to Hamilton's house. Hamilton testified that Porter and Smith accompanied

17

Bates to Hamilton's house on this day. Bates went inside, while Porter and Smith remained in Smith's car. Bates asked Hamilton for $10,000, indicating that he feared that Smith and Porter would kill him. Hamilton refused to give Bates any money.

This was not the only time Hamilton encountered Smith and Porter. Hamilton also testified as to the events of June 11, 2011. On this day, Smith and Porter broke into Hamilton's home, shooting and injuring Hamilton, and shooting and killing his long-time partner.

On cross-examination, defense counsel impeached Hamilton with the following facts: Hamilton was convicted of wire fraud and bank fraud in the past; Hamilton was jealous of Bates's relationships with women to the point that he caused public disturbances outside Bates's house resulting in Hamilton's arrest on at least two occasions; and Hamilton had a life insurance policy on Bates worth $500,000. Separately, Hamilton testified that he still loved Bates and even sent Bates $100 on his most recent birthday.

To corroborate Smith's testimony about taking Bates's Mercedes and Corvette as collateral, the Government offered the testimony of Detective Sal Mangano of the Kenner Police Department. He regularly patrolled Bates's neighborhood and testified that he always paid attention to Bates's cars because they were "nice" cars. Detective Mangano testified that Bates's Mercedes and Corvette were missing from Bates's residence, where they were usually parked, for months during the relevant time period. Hancock and Hamilton also testified that they noticed the cars were missing.

Officer Nick Engler of the Kenner Police Department testified that Bates reported receiving a threatening phone call on April 25, 2011, in which an individual tried to extort money from Bates for a murder. According to Officer Engler, Bates provided no details about the identity of the caller, that his cars had been taken in the past, or that he had been approached for money at any time before this phone call. Sergeant Nicole Powell of the New Orleans Police Department responded to a call from Bates on April 26, 2011, related to threats

allegedly made to Bates.  Bates mentioned that his jewelry had been stolen and that his friend had been killed, but never told Sergeant Powell that he thought he was receiving threats related to either of these events. He simply stated to her that he feared for his life and that people were jealous of his wealth.

On April 4, 2013, Bates was arrested by Special Agent Beau Barker and two other agents.  Special Agent Barker testified that, at the time, Bates initially denied any knowledge of who murdered the Victim.  Bates did not tell the agents he was being extorted for money or that he had any knowledge of Smith or Porter.  Later, however, Bates told the agents that two individuals had killed the Victim and then tried to extort him for money.  Bates said he did not know the killers' names, but that he could identify them in pictures.  Special Agent Barker testified that Bates told the agents that he had already reported this information to Marlin Defillo, then assistant superintendent in the New Orleans Police Department, and another unidentified officer.  Marlin

Defillo, however, testified at trial that Bates never reported anything of the kind to him.

The Government also called Anthony Comadore, a prisoner incarcerated at St. Tammany Parish Prison with Bates, to testify about statements Bates made to Comadore. Comadore testified that Bates told him that a man named Walter Porter "took care of some business" for him. Comadore understood this to mean that Bates hired Porter to kill someone. At a later time, Bates also bragged to Comadore about paying Porter to "take care of" the Victim for stealing jewelry.

Special Agent Keith Buriss testified as to much of the documentary evidence on which the Government relied. Agent Buriss testified that up until November 21, 2010, the available phone records demonstrated no contact between Smith and Bates. Between November 21, 2010, and February 10, 2011, however, Bates and Smith contacted each other 205 times. There was one additional call on March 25, 2011, and then no contact between Bates and Smith for the remainder of 2011. In 2012, there were fifteen contacts between Bates and Smith. As to contacts

21

between Smith and Porter: between November 1 and November 18, 2010, there were nine contacts and 117 contacts after this point through early December.  As to contacts between Bates and Porter: there was no contact before November 23, 2010, and twelve contacts between November 23 and December 7, 2010.  As to contacts between Bates and his cousin, Nakeyius Jackson, Agent Buriss testified that there were five contacts on November 19, 2010, the day that Smith testified Bates offered him $20,000 for the murder.  Agent Buriss also examined Jackson's bank records, because Smith testified that Jackson told him the initial $2000 payment came out of Jackson's girlfriend's bank account.  Jackson's bank records show two withdrawals on November 19, 2010: one for $3000 from Jackson's personal account, which was then deposited into another account held jointly with his girlfriend, and one for $2000 from Jackson's personal account.  The records also reflect other withdrawals after November 19 in varying amounts.

Bates presented several witnesses.  Joe Ann Walker, his former hair stylist, testified as to the February 8,

2011, $10,000 deposit into Bates's bank account and to the February 10, 2011, $10,000 withdrawal from Bates's bank account. According to Walker, she arranged the sale of one of Bates's vehicles in 2011; she could not recall the exact date. She testified that Bates initially sold the vehicle for $10,000 in cash, but the sale fell through, so Bates returned the $10,000 to the purchaser. Bates provided the same account in his testimony to explain the February 8 and February 10, 2011 account activity.

Jacques Lewis, a personal friend of Bates, testified that Bates never told him he hired anyone to kill the Victim. Lewis believed that Bates was being extorted for money. He further testified that it was common knowledge around the carwash that Bates's jewelry had been stolen. Finally, Lewis stated that he encouraged Bates not to report the extortion to the police because he feared that Bates would be killed.

Nakeyius Jackson, Bates's cousin, testified that he gave Bates $2000 to pay his house note and buy supplies for the carwash. He denied that the money was intended

to be used to pay Smith and Porter for the murder.
Additionally, Jackson testified that he could not recall
whether he withdrew the $2000 for Bates before or after
the murder.  On April 28, 2015, however, Jackson told the
Government that he withdrew the $2000 before the murder.
Finally, Jackson testified that he urged Bates not to go
to the police for fear of retaliation.

Bates testified in his own defense.  Bates stated
that he had met Aaron Smith before November 2010.
According to Bates, Smith wanted to associate with Bates
due to his perception of Bates's wealth.[6]  Bates testified
that he met Smith at the carwash on November 19, 2010,
but denied asking Smith to kill the Victim.  According to
Bates, Bates told Smith about the stolen jewelry and
money, and Smith responded that he could get Bates's
jewelry and money back.  Bates denied hiring Porter to
kill the Victim or even meeting Porter before the murder.
He further denied using Facebook at any point in his
life.  As to the call from Bates to Smith on the evening

---

[6]      Smith denied this at trial.

24

of the murder on November 21, 2010, Bates said that he
returned Smith's call, and Smith asked if he had heard
what happened and told him to watch the news. Bates then
testified that Hancock, contrary to her testimony, did
not spend the night at his house that evening, and that
she was not present on the morning of November 22, 2010,
when she testified Bates learned of the Victim's murder
at home via the morning news. On cross-examination,
however, the Government impeached this testimony with
multiple statements made by Bates to law enforcement that
Hancock had spent that entire night with him. According
to Bates, he did not learn of the murder until he arrived
at his carwash on the morning of November 22, 2010.

Bates also admitted to renting a car for Smith on
November 23, 2010. Contrary to Smith's testimony, Bates
testified that he and Smith took separate cars to Hertz.
Bates vaguely testified that another individual may have
been in Smith's car, but Bates never mentioned Porter.
Bates testified that he then rented a car and gave it to
Smith. According to Bates, he regularly rented cars for
customers, so this was not unusual. Bates further

25

testified that Smith and Porter came to the carwash that evening.  According to Bates, this was the first time he ever met Porter.  Porter told Bates that he had done him a favor and that Bates now owed him money for the murder of the Victim.  Bates testified that he told Porter he did not have any money.  Bates stated that Smith and Porter told him that they would kill him if they did not get their money.  According to Bates, only after the rental car was returned to Hertz did Porter and Smith inquire about taking Bates's other cars: the Mercedes and Corvette.  Bates testified that, over the next several weeks, Porter and Smith continued to come to the carwash to collect money.  Bates stated that he gave them a few thousand dollars; he denied giving them the $2000 his cousin, Jackson, had given to him.

Bates gave a police interview related to the stolen jewelry and the murder on December 16, 2010, but he did not report the alleged threats and extortion by Porter and Smith.  At trial, he said he did not do so because he feared for his life.  Bates testified that Porter did not kill him for failing to pay the money because Porter knew

Bates was a "big-hearted person."  Bates also denied ever telling Hancock, Hamilton, or Comadore that he paid to have the Victim murdered.  Finally, Bates testified that he never reported the purported ongoing extortion by Smith and Porter to the police because he feared for his life.

## III. MOTION FOR JUDGMENT OF ACQUITTAL

### A. Standard

"A motion for judgment of acquittal challenges the sufficiency of the evidence to convict." *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005) (quoting *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998)).  When the defendant challenges the sufficiency of the evidence, "the relevant questions is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 433 U.S. 307, 319 (1979); *see also United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir. 2005) (applying *Jackson*).  The same test

applies whether the government's case depends on direct or entirely circumstantial evidence. *United States v. Thomas*, 627 F.3d 146, 151 (5th Cir. 2010) (citing *United States v. Clayton*, 506 F.3d 405, 412 (5th Cir. 2007)). The Court considers the evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the Government. *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008); *see also United States v. Resio-Trejo*, 45 F.3d 907, 910-11 (5th Cir. 1995). The Court does not weigh the evidence or assess the credibility of witnesses. *Ramos-Cardenas*, 524 F.3d at 605. The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilty, and the jury is free to choose among reasonable constructions of evidence. *Id.; see also Resio-Trejo*, 45 F.3d at 911. The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Loe*, 262 F.3d 427, 432

(5th Cir. 2001) (citation and internal quotation marks omitted).

## B. Analysis

Bates raises three grounds in support of his motion for a judgment of acquittal.  First, Bates asserts that the Government produced insufficient evidence to allow the jury to conclude that the November 19, 2010 meeting between Smith and Bates occurred and that the November 20, 2010 meeting between Smith, Porter, and Bates occurred.  Second, Bates contends that the jury could not have believed Government witnesses Aaron Smith, Denisa Hancock, Keith Hamilton, and Anthony Comadore because they were not credible.  Finally, Bates asserts a Sixth Amendment violation stemming from the testimony of Comadore.

### 1. The November 19 and November 20, 2010 Meetings

Bates first contends that he is entitled to a judgment of acquittal because the Government failed to prove that he met with Smith or Porter before the murder occurred.  This, Bates asserts, undermines any finding that he hired Smith and Porter to kill the Victim.  Bates

29

asserts that the Government's case was predicated on two
faulty hypotheses: (1) that Aaron Smith met Bates at his
carwash on November 19, 2010, when Bates allegedly
solicited Smith to commit the murder-for-hire and said he
was willing to pay $20,000; and (2) that Smith took
Porter to the carwash the next day, November 20, 2010,
when Bates allegedly confirmed the $20,000 hire, showed
Smith a picture of the Victim on Facebook, and stated
that he was hiring them because the Victim had stolen his
jewelry and money.  Specifically, Bates contends that the
cell-site location analysis and Smith's ankle monitor log
show that the November 20, 2010 meeting must have
occurred during a shorter window of time than represented
by the Government during trial.  According to Bates,
because these records show that Smith lied about the
November 20 meeting, his testimony regarding the November
19, 2010 meeting between himself and Bates should be
viewed in a new light and disregarded as unreliable.

The Government produced ample evidence to show that
Bates met Smith on November 19, 2010, and Smith and
Porter on November 20, 2010, and discussed the murder-

for-hire.  Aaron Smith testified that he met Bates on November 19, 2010, at which time Bates offered Smith $20,000 in exchange for the murder.  Bates himself testified that he met with Smith at the carwash on this day.  Smith testified that the following day, November 20, 2010, he and Porter met with Bates, and Bates made the same offer of $20,000 for Porter to murder the Victim.  According to Smith, Bates showed Smith a picture of the Victim on Facebook using Smith's iPhone and provided Smith the Victim's address and a description of the Victim's vehicle.  Hancock, Hamilton, and Comadore corroborated Smith: all three witnesses testified that Bates admitted to them that he hired Smith and Porter to kill the Victim.

In challenging the November 20, 2010, meeting, Bates relies on his interpretation of the Government's cell-site location analysis and Smith's ankle monitor log. Bates's counsel previously presented this argument to the jury during closing arguments.  According to Bates, the Government's cell-site location analysis presented at trial indicated that Bates, Smith, and Porter could have

met at Bates's carwash on November 20, 2010, either between 8:34 a.m. and 10:13 a.m. or between 10:15 a.m. and 11:02 a.m.  Bates now contends that the Government's analysis failed to include reference to Smith's ankle monitor log, which showed that Smith left his home, which is approximately ten to fifteen minutes from Bates's carwash by defense counsel's estimate, on this day at 9:36 a.m. and returned at 10:54 a.m.  Taking this into account, along with Porter's cell phone records, Bates posits that the Government has shown that the November 20, 2010 meeting could have occurred only between 9:45 and 10:00 a.m. and 10:30 and 10:45 a.m.  Bates contends that his interpretation of the evidence shows that the November 20, 2010, meeting could not have occurred.  The record does not support this assertion.

By Bates's own concession, his interpretation of the evidence still leaves two fifteen-minute windows, a total of thirty minutes, in which Smith and Porter could have met Bates at his carwash on the morning of November 20, 2010.  There is no evidence in the record suggesting that the meeting lasted longer than fifteen minutes or that it

could not have occurred in this time. Thus, Bates's interpretation of the evidence does not preclude the possibility of the meeting occurring on November 20, 2010. Moreover, defense counsel already presented this argument to the jury during closing arguments. The jury either rejected Bates's interpretation of the evidence or decided the records still corroborated Smith's testimony. Finally, the cell-site location analysis and ankle monitor log provided are not the only pieces of evidence showing that the meeting occurred on November 20. As described, Smith testified in great detail about this meeting.

Bates next asserts that the Government provided insufficient evidence to show that Smith met Bates at the carwash on November 19, 2010. Initially, the Court notes that Bates himself testified at trial that he met with Smith at the carwash on November 19, 2010. Further, Smith testified in detail about the November 19 meeting. Bates contends that the jury should have disregarded Smith's testimony because the cell-site location analysis and ankle monitoring log show that Smith lied about the

November 20, 2010, meeting, Smith was testifying under a plea agreement, Smith admitted to using drugs, and Smith offered testimony in one instance inconsistent with the factual basis for his guilty plea.   Having already concluded that Smith's testimony about the November 20, 2010 meeting is corroborated by other evidence, the Court rejects the primary basis for Bates's argument.   Further, based on defense counsel's cross-examination of Smith, the jury was acutely aware that Smith testified under a plea agreement, admitted to using drugs, and offered testimony in one instance inconsistent with his factual basis.   More importantly, the Court will not second guess the jury's weighing of Smith's credibility on a motion for a judgment of acquittal.   *See Loe*, 262 F.3d at 432 (The jury "retains the sole authority . . . to evaluate the credibility of the witnesses." (citation and internal quotation marks omitted)).

Viewing the evidence in the light most favorable to the Government and giving deference to the jury's credibility determinations, a rational jury could have found that Bates met with Smith on November 19, 2010, to

orchestrate the murder-for-hire, and met with Smith and Porter on November 20, 2010, to do the same.

### 2. Credibility of the Witnesses

Bates next moves for a judgment of acquittal because Smith, Hancock, Hamilton, and Comadore were not credible witnesses.  Each of these witnesses testified that Bates admitted to them that he orchestrated the murder-for-hire.  Bates's challenge must fail because the Court will not evaluate the credibility of the witnesses on a motion for judgment of acquittal.

### 3. Testimony of Anthony Comadore--Sixth Amendment

Bates also contends he is entitled to a judgment of acquittal because the Government's case was based in part on the testimony of Anthony Comadore.  Bates asserts that the Government used Anthony Comadore as an agent to solicit incriminating evidence from him in violation of his Sixth Amendment rights.  Defense counsel raised this objection at trial and the Court denied it.  On January 18, 2013, Comadore pled guilty to a bill of information charging him with two counts of possession with intent to distribute cocaine base and two counts of being a felon

in possession of a firearm.[7]  Under his plea agreement, Comadore agreed "to assist the Government with regard to the investigation and prosecution of criminal conduct." At trial, Comadore stated that he was testifying under this provision of his plea agreement.

Comadore and Bates were incarcerated together in St. Tammany Parish Prison.  Comadore testified that he and Bates discussed the crimes for which they were both incarcerated.  At some point during these discussions, Comadore showed Bates a newspaper article referencing Walter Porter's alleged murders.  Comadore testified that Bates stated that he had hired Porter to "take care of business" for him and that Comadore understood this to mean that Bates had hired Porter to kill someone.  After these discussions, Comadore met with the Government for the first time related to Bates's case on May 1, 2015, and shared Bates's statements with them.  Until this point, Comadore and the Government had never spoken about Bates's case.  At trial, the Government represented that,

---

[7]    *United States v. Anthony Comadore*, Criminal Action Number 12-256 (E.D. La.).

36

at the May 1, 2015 meeting, it never directed Comadore to elicit statements from Bates or to ask Bates any additional questions.   After the May 1, 2015, meeting, and approximately two weeks before trial, Bates made additional statements to Comadore.   Comadore testified, "I didn't actually ask [Bates] questions . . . ." Comadore testified that Bates showed him pictures of the stolen jewelry, told Comadore that the Victim had stolen the jewelry, and, in Comadore's words, "bragged" that he had paid Porter to "take care" of the Victim.    In contrast, Bates testified that Comadore asked him many questions about his case.

An individual's Sixth Amendment rights are violated when federal agents deliberately elicit from him after he has been indicted and in the absence of counsel. *Massiah v. United States*, 377 U.S. 201, 206 (1964).   A *Massiah* violation occurs when "(1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel being present; and (3) the agent 'deliberately elicit[s]' incriminating

statements from the defendant." *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014) (quoting *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006) (alteration in original)). "The right to counsel attaches when the defendant is indicted." *Id.* (citing *Patterson v. Illinois*, 487 U.S. 285, 290-91 (1988)).

"A *Massiah* violation can occur when the government agent is an undisclosed government informant." *Id.* (citing *United States v. Henry*, 447 U.S. 264, 269-74 (1980)). When the Government obtains information through an informant, the defendant must show that the informant, on behalf of the Government, deliberately used his position to secure incriminating information from the defendant when counsel was not present. *Henry*, 447 U.S. at 270. The defendant, however, does not show a violation "simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the [government]. Rather, the defendant must demonstrate that the [government] and their informant took some action, beyond merely listening, that was designed deliberately to elicit

38

incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). "[T]he Sixth Amendment is not violated whenever--by luck or happenstance--the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

Here, Bates cannot show a *Massiah* violation because there is no evidence that Comadore acted as a government agent when Bates made the inculpatory statements to him. As the Fifth Circuit holds, absent a *quid pro quo* between the informant and the Government and absent any instruction or control by the Government, an informant is not a government agent for purposes of *Massiah*. *Creel v. Johnson*, 162 F.3d 385, 394 (5th Cir. 1998).[8] Here, there is no evidence that Comadore ever acted under any

---

[8]   In *Creel*, the Fifth Circuit declined to address whether the defendant had to prove both prongs of this test because he failed to prove either. *Creel*, 162 F.3d at 394 n.6.  The Fifth Circuit and district courts, however, have since required defendants to prove both prongs. *See e.g.*, *United States v. Cutno*, 431 F. App'x 275, 280 (5th Cir. 2011) (finding that informant was not an agent when there was "no evidence to demonstrate that [he] was acting at the Government's behest"); *Woods v. Quarterman*, No. 6:06cv344, 2009 WL 2757181, at *11 (E.D. Tex. Aug. 26, 2009) (finding that informant was not an agent in the absence of instructions from the state or state control).

government instructions to elicit statements from Bates. Bates made the first set of statements to Comadore before the Government ever met with Comadore about Bates's case. Further, during Comadore's meeting with the Government on May 1, 2015, there is no evidence that the Government instructed Comadore to elicit any statements from Bates or to ask him any additional questions. *Id.* (holding informant not an agent when she "did not receive, nor was she promised, any benefits in exchange for eliciting information from" the defendant). Indeed, defense counsel uncovered no evidence of government instruction in cross-examining Comadore as to his relationship with the Government. *See United States v. Bell*, 290 F. App'x 178, 183 (10th Cir. 2008) (finding no *Massiah* violation when defendant "presented no evidence . . . that [the informant] was a government agent"). Further, simply that Comadore testified under a plea agreement from a separate case does not make him a government agent for the purpose of *Massiah*. *See Cutno*, 431 F. App'x at 279-80 (finding no *Massiah* violation when the informant was cooperating under a plea agreement in a different case

40

and in the absence of evidence indicating the informant "was acting at the Government's behest at the time that [the defendant] made his confession"); *United States v. Moore*, 178 F.3d 994, 999 (8th Cir. 2003) (finding no *Massiah* violation when "[t]o the extent there was an agreement between [the informant] and the government, there [was] no evidence to suggest it had anything to do with [the defendant]"). Because there is no evidence that the Government instructed Comadore to ask Bates questions or elicit statements from him, there is no evidence that Comadore acted as a government agent when Bates made the inculpatory statements to him. *See Cutno*, 431 F. App'x at 279-80; *Woods*, 2009 WL 2757181, at *11 (finding no *Massiah* violation in the absence of evidence that the informant "acted pursuant to instructions from the state, or otherwise submitted to the state's control"); *see also United States v. LaBare*, 191 F.3d 60, 65-66 (1st Cir. 1999) ("Where a jail mate simply agrees to report whatever he learns about crimes from other inmates in general, we think there is not enough to trigger *Massiah*."); *United States v. Birbal*, 113 F.3d

41

342, 346 (2d Cir. 1997) ("[A]n informant becomes a government agent for purposes of *Kuhlmann* only when the informant has been instructed by the police to get information about the particular defendant." (collecting cases)).  Bates' Sixth Amendment claim therefore fails.

Accordingly, the Court denies Bates's motion for a judgment of acquittal.


## IV. MOTION FOR NEW TRIAL

### A. Standard

Rule 33(a) of the Federal Rules of Criminal Procedure states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires . . . ."  Fed. R. Crim. P. 33(a). "Motions for new trial are based either on the grounds that the verdict was against the weight of the evidence or that some error was committed by the court or the prosecution which substantially affects the rights of the accused."  *United States v. Simms*, 508 F. Supp. 1188, 1202 (W.D. La. 1980).  A court "should not grant a motion for new trial unless there would be a miscarriage of

42

justice or the weight of the evidence preponderates against the verdict." *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004); *see also United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011) ("[M]otions for new trial are disfavored and must be reviewed with great caution."). "A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant." *Id.* (citing *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997)). Unlike reviewing a motion for judgment of acquittal, a court must "carefully weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for new trial." *United States v. Herrera*, 559 F.3d 296, 302 (5th Cir. 2009) (quoting *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005)). But a court "must not entirely usurp the jury's function or simply set aside a jury's verdict because it runs counter to [the] result the district court believed was more appropriate." *Id.*

## B. Analysis

The Court finds that the interest of justice does not mandate a new trial. First, the weight of evidence

preponderates in favor of the verdict. As described, the Government produced overwhelming evidence of Bates's guilt. Smith testified at great length about the murder-for-hire plot. The Government corroborated Smith's testimony with cell phone records, cell-site location analysis, a rental car receipt, traffic citations, and the testimony of other witnesses. Bates challenges whether the Government's cell-site location analysis corroborated Smith's testimony, but the Court has already considered and rejected this argument, see Part III.B.1, infra, and does so again after weighing the evidence. As stated, there is no evidence suggesting the meeting between Bates, Porter, and Smith could not have occurred during one of the two fifteen-minute windows under defense counsel's interpretation.

Further, the Court finds Smith's testimony credible. Smith's testimony was corroborated in many instances by objective evidence. That Smith testified in one instance inconsistent with the factual basis for his guilty plea, testified under a plea agreement, admitted to using drugs, and stated that he would lie to the police does

not destroy his credibility. *See United States v. Blackthorne*, 378 F.3d 449, 455 (5th Cir. 2004) ("[E]vidence which merely discredits or impeaches a witnesses' testimony does not justify a new trial." (quoting *United States v. Pena*, 949 F.2d 751, 758 (5th Cir. 1991); *United States v. Allen*, No. 12-138, 2015 WL 1638039, at *8 (E.D. La. Apr. 13, 2015) ("Fifth Circuit case law is clear that a co-conspirator's testimony alone may be sufficient to convict, despite any expected benefit from the Government for testifying.").

In addition, no less than three other witnesses testified that Bates admitted to them that he paid Smith and Porter to murder the Victim. The Court finds credible the testimony of Hancock, Hamilton, and Comadore. Despite defense counsel's categorization of Hancock and Hamilton as Bates's jilted ex-lovers, the Court found their testimony entirely credible. Both testified that they held no grudge against Bates. Indeed, Hamilton testified that he still loved Bates and even sent Bates $100 on his most recent birthday. Hancock testified that she had no desire to testify

against Bates.   Moreover, the Court does not discredit Comadore's testimony simply because he testified under a plea agreement requiring his cooperation.   Further, the consistency of Hancock's, Hamilton's, and Comadore's testimony lends it credibility.   Thus, after weighing the evidence and the witnesses' credibility, the Court finds that the weight of the evidence supports the jury's verdict.

Second, the Court finds no miscarriage of justice justifying a new trial.   As stated, the Court has rejected Bates's contention that the Government presented two false hypotheses regarding the November 19 and November 20, 2010 meetings.   As to the November 19, 2010 meeting, both Smith and Bates testified that the meeting occurred and Smith testified in detail as to Bates's offer of $20,000 for the murder.   As to the November 20, 2010 meeting, Smith testified that the meeting occurred between himself, Porter, and Bates, and that Bates again offered them $20,000 to murder the Victim and also provided information to Smith to assist in carrying out the murder.   As the Court has already explained, other

evidence corroborated Smith's testimony. While Bates argues that the Government's presentation falsely corroborated Smith's account because it misled the jury into believing the meeting could have occurred during a longer period of time, even Bates's interpretation leaves a total of thirty minutes in which the meeting could have occurred. Further, defense counsel presented this interpretation of the evidence to the jury during his closing argument and specifically highlighted Smith's ankle monitor log on the morning of November 20. The jury was clearly aware of all of the evidence and either rejected Bates's interpretation or found it consistent with the other evidence. Finally, as to Comadore's testimony, the Court has found that no Sixth Amendment violation occurred related to Bates's inculpatory statements to Comadore.

Accordingly, the Court finds that a new trial is not warranted because the weight of the evidence supported the jury's verdict and there is no error justifying a new trial.

**V. CONCLUSION**

For the foregoing reasons, Bates's motion for judgment of acquittal and for new trial is DENIED.

New Orleans, Louisiana, this ___10th___ day of September, 2015.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE